UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

UNITED STATES OF AMERICA

                             10 Cr. 222

    -against-                     OPINION

VLADIMIR ALEXIS MORILLO-VIDAL, and
JOHN CARTAGENA

                  Defendants.

-------------------------------------X

A P P E A R A N C E S :

        Attorney for United States of America

        PREET BHARARA
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, NY  10007
        By:  Ryan P. Poscablo, Esq.
            Margaret Garnett, Esq.


        Attorneys for Defendants

        THE LAW OFFICE OF LONDON & ROBIN
        99 Park Avenue
        New York, NY 10016
        By:  Ira D. London, Esq.

        THE LAW OFFICE OF JAMES M. BRANDEN
        551 Fifth Avenue
        New York, NY 10176
        By:  James M. Branden, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/19/11

**Sweet, D.J.**

Defendants Vladimir Alexis Morillo-Vidal and John Cartagena ("Defendants" or "Morillo-Vidal" and "Cartagena") have moved for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or, in the alternative, for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  For the reasons set forth below, their motions are denied.

**Prior Proceedings**

On October 19, 2010, Defendants Morillo-Vidal and Cargagena were charged by grand jury in a three count Indictment, S2 10 Cr. 222 (RWS).  Count One of the Indictment charged both Defendants with conspiring to distribute cocaine, in violation of 21 U.S.C. § 846.  Count Two charged Morillo-Vidal with attempting to possess cocaine with the intent to distribute, in violation of 21 U.S.C. § 846.  Count Three charged Cartagena with possessing cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(b)(1)(A).

On November 29, 2010, the trial commenced.

1

At trial, with regard to Cargagena, the Government presented the testimony of a number of witnesses including James Seyfried ("Seyfried"), a co-conspirator of Cartagena's and a cooperating witness; Cory Townsend ("Townsend"), a Trooper with the Nebraska State Patrol; and New York Police Department Detective William Hotchkiss ("Hotchkiss") and DEA Special Agent Thomas Throne ("Throne") concerning Cartagena's post-arrest statements. In addition, at trial, the Government presented physical and documentary evidence, including approximately 67 kilograms of cocaine, latex gloves, as well as various phones, tools, and documents.

With regard to Morillo-Vidal, at trial the Government presented the testimony of co-conspirators Seyfried and Audrey Bonanno ("Bonanno"); Special Agent Edward Pieszchata ("Pieszchata") of the DEA; Larry Smith ("Smith"), a custodian at MetroPCS; Ruth Fried ("Fried"), a school counselor and college adviser at Gregorio Luperon High School; as well as Defendant Morillo-Vidal. In addition, the Government presented physical and documentary evidence including stipulations of fact concerning cellphone records and cell site information;

Defendant's post arrest statements; and physical items, including Defendant's cellphones.

At the close of the Government's case, counsel for Defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a).  The Court denied Defendants' motion.

On December 7, 2010, the jury returned a guilty verdict on Counts One, Two and Three and found that the amount of drugs at issue for each count was more than 5 kilograms of cocaine.

The instant motions were heard on March 31, 2011.

**The Applicable Standards**

Rule 29 of the Federal Rules of Criminal Procedure provides that "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2). On a motion for a judgment of acquittal pursuant to Rule 29, the Court must uphold a jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S.

3

307, 319 (1979) (emphasis in original); see also United States
v. Parkes, 497 U.S. 220, 225-26 (2d Cir. 2007); United States v.
Glenn, 312 F.3d 58, 63 (2d Cir. 2002); United States v.
Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).


In considering a Rule 29 motion, the Court "review[s]
all of the evidence presented at trial 'in the light most
favorable to the government, crediting every inference that the
jury might have drawn in favor of the government.'" United
States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999) (quoting
United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996)).
The Court must affirm a conviction "so long as, from the
inferences reasonably drawn from the record as a whole, the jury
might fairly have concluded that the defendant was guilty beyond
a reasonable doubt." United States v. Matthews, 20 F.3d 538, 548
(2d Cir. 1994).


Rule 33 provides that "[u]pon the defendant's motion, the
court may vacate any judgment and grant a new trial if the
interest of justice requires." Fed. R. Crim. P. 33(a). "The
'ultimate test' [under Rule 33] is 'whether letting a guilty
verdict stand would be a manifest injustice. . . . There must be
a real concern that an innocent person may have been

4

convicted.'" United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) (quoting United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001)).   District Courts exercise "broad discretion" in considering whether to grant a new trial.   Id. at 348; United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995). However, "motions for a new trial are disfavored in this Circuit." Gambino, 59 F.3d at 364.

As set forth below, the instant motions fail to meet the above standards and are therefore denied.

## Defendants' Rule 29 Motions are Denied

Defendant Cartagena argues in support of his motion for a judgment of acquittal that Seyfried's testimony was not credible, and that the evidence presented at trial was insufficient to establish Cartagena's knowing participation in the charged offenses. See Brief of Defendant Cartagena (hereafter "Cartagena Br.") at 9-13.   Defendant Morillo-Vidal argues that the Government failed to produce sufficient credible evidence to prove that (1) Morillo-Vidal knew that the bag he received from Audrey Bonanno on behalf of Carlos Pereida (a/k/a "Bubu") actually contained cocaine, and (2) that he knowingly

5

participated in a five-kilogram cocaine distribution conspiracy. See Brief of Defendant Morillo-Vidal (hereafter "Morillo-Vidal Br.") at 1, 13-25.   At oral argument, counsel for Defendant Morillo-Vidal further asserted that the Government erred in putting Ruth Fried, a guidance counselor and college advisor at Gregorio Luperon High School, on the stand without first subjecting her to a reliability hearing.

## A. The Jury Could Rationally Conclude that Cartagena Knowingly Participated in a Narcotics Conspiracy

When viewed in its totality, the evidence cited below was sufficient for the jury to rationally conclude that Cartagena knowingly participated in a conspiracy to distribute more than five kilograms of cocaine and that he knowingly possessed with the intent to distribute more than five kilograms of cocaine.

### 1. The Testimony of James Seyfried

Seyfried credibly testified that he had known Cartagena for approximately 25 years and that, in February 2010, he asked Cartagena to assist him in picking up cocaine in Phoenix to be transported to New York. Seyfried testified that Cartagena accompanied him to Phoenix to pick up the drugs. Seyfried

6

explained that he and Cartagena met with an individual named Roberto to pick up the cocaine, and that before doing so, he and Cartagena bought certain supplies, including a multi-tool set and latex gloves to use when handling the cocaine. Seyfried testified that after he and Cartagena arrived at Roberto's house, they put on the gloves, counted the bricks of cocaine, and transported them to a rented recreational vehicle ("RV"). Seyfried explained that there were 67 kilos of cocaine; and that each kilo was a brick wrapped in silver tape with black lettering. He further testified that after he and Cartagena carried the bricks to the RV, Cartagena stored them under RV's bench seat. Seyfried recounted how he and Cartagena began the drive from Phoenix to New York, and that while driving through Nebraska, they were stopped by a Nebraska State Trooper. Seyfried explained that after being stopped by the State Trooper, he gave the Trooper consent to search the vehicle where the Trooper found the cocaine.

Seyfried's testimony was credible, supported by the physical evidence, and corroborated by the testimony of the other Government witnesses, as discussed below.

**2. The Testimony of Nebraska State Trooper Cory Townsend**

Nebraska State Trooper Cory Townsend credibly testified that, on the night of February 28, 2010, while patrolling Interstate 80, he stopped an RV containing Seyfried, Cartagena and 67 kilograms of cocaine, after seeing the RV fail to signal before changing lanes. Townsend testified that he separately questioned Seyfried and Cartagena, and that their responses as well as the circumstances of their trip, raised his suspicion that criminal activity was afoot. Specifically, Townsend testified that Seyfried and Cartagena gave conflicting and implausible accounts of what they visited and when, as well as the purpose of their trip. Townsend asked each of them directly whether there was any contraband, including narcotics, in the RV. Both Seyfried and Cartagena responded that there were no narcotics in the RV. Townsend then requested and received permission from both Seyfried and Cartagena to search the vehicle. In addition to his testimony, the jury watched video and listened to audio of the stop that was recorded from Townsend's patrol car.

During his search, Townsend recovered approximately 67 kilograms of cocaine in a storage area under a seating bench in the RV. Townsend cut open one of the packages and discovered a

8

white powdery substance consistent with cocaine. In addition to
the cocaine, Townsend and Nebraska State Trooper Neil Frederick,
who had arrived shortly after the stop, recovered, among other
items, a package of latex gloves contained in a white plastic
CVS pharmacy bag, suitcases, cellphones, and various documents,
including numerous receipts.

### 3. Statements Made by Cartagena to DEA Special Agent Thomas Throne and NYPD Officer William Hotchkiss

Special Agent Throne testified that he and members of his
team, including DEA Special Agent Edward Pieszchata and
Detective Hotchkiss, among others, flew to Nebraska in order to
pick up Cartagena and Seyfried.  Throne testified that during
the flight back to New York, Cartagena stated that he had flown
with approximately $250,000 of cash with James Seyfried from a
New York airport out to Los Angeles.

### B. The Jury Could Rationally Conclude that Morillo-Vidal Knew that He Was Picking Up and Carrying a Controlled Substance and Participating in a Narcotics Conspiracy

When viewed in its totality, the evidence presented at
trial was sufficient for the jury to reasonably infer that
Morillo-Vidal knew that the bag he retrieved from Bonanno's SUV

contained cocaine and that he knowingly participated in a narcotics conspiracy.

**1) The Testimony of James Seyfried**

James Seyfried provided significant background information concerning the narcotics conspiracy, including providing the names and roles of various other players involved.

**2) The Testimony of Audrey Bonanno**

Audrey Bonanno testified that she became involved in this narcotics conspiracy through an individual named "Manny." Bonanno explained that Manny had provided her with a Nextel phone that he would use to contact her and that she received several phone calls on that phone from Manny, Seyfried, and another individual named "Bubu," on March 3, 2010. She further testified that that phone was used only for drug-related conversations, and that Manny had told her that she would be receiving a call that day to pick up drugs. She further testified that during a telephone conversation on March 4, 2010, Bonanno and Bubu discussed the drugs she picked up from Seyfried

10

and began to make arrangements for the delivery of those drugs to Bubu.

Bonanno explained that, after making arrangements with Bubu concerning the delivery of the cocaine, she received several phone calls from an individual later identified as Defendant Morillo-Vidal. She testified that she arranged to meet with Morillo-Vidal at a McDonald's on the West Side of Manhattan after work on March 4, 2010. After he arrived, Defendant handed Bonanno his cellphone to speak to Bubu as a confirmation call saying the two were together. Bonanno testified that after she and Defendant walked to her vehicle, she opened the vehicle's hatch causing the light in her trunk to turn on, and that located within her trunk area/rear seat were two bags: a duffle bag and a suitcase. She testified that the duffle bag was "halfway open" and that the bricks of cocaine contained therein were visible. She further testified that Morillo-Vidal put his hand inside the bag in order to face the cocaine down and that he then proceeded to zip the bag. She explained that the cocaine she saw in the bag was in brick form wrapped in duct tape similar to how the cocaine was packaged when she retrieved it from James Seyfried on March 3, 2010. Bonanno explained that

11

Morillo-Vidal then picked up the bag and began to carry it to his car, where he was placed under arrest by DEA agents.

## 3) The Testimony of Special Agent Thomas Throne

Special Agent Throne of the DEA provided testimony regarding the sham cocaine, how it was packed in a duffle bag and a suitcase, how the zipper was left open in the duffle bag to reveal the sham cocaine, and how he placed the bags in the back of Audrey Bonanno's vehicle once it was parked in the McDonald's parking lot.  Throne testified that the sham cocaine was prepared to look like the real cocaine that was seized in Nebraska, that he placed the sham cocaine into a duffle bag and a suitcase, which he then placed in the rear trunk area of Bonanno's vehicle. Throne explained that when he packed the duffle bag with the sham cocaine, he specifically left a proration of it unzipped "so you could see" the individual bricks of sham cocaine. Throne testified that when he left the bags in Bonanno's car, the sham cocaine was clearly visible in the duffle bag.

Throne further testified that, while Morillo-Vidal was being placed in handcuffs, Throne saw Morillo-Vidal's phone

ringing and the caller was "Landia Bubu." In addition, Throne testified that Morillo-Vidal stated that he did not know that he was picking up narcotics from Bonanno, but was rather sent there by a friend who owned a clothing store to pick up clothes. Morillo-Vidal further told Throne that he had not made any calls that day about the meeting, but rather that the meeting had been arranged four days prior.

**4) The Testimony of Special Agent Edward Pieszchata**

Special Agent Pieszchata testified that he was with Bonanno in the McDonald's both prior to and during her meeting with Morillo-Vidal. He explained that he placed an audio recorder on Bonanno in order to record her conversation with Morillo-Vidal. That recording was placed into evidence during trial. Pieszchata testified that at approximately 6:30 p.m., on March 4, 2010, he observed Morillo-Vidal arrive at the McDonald's. He explained that the Defendant said to Bonanno "you spoke to my brother earlier," to which Bonanno replied "yes." He testified that he then watched Bonanno and Morillo-Vidal walk outside towards Bonanno's car.  After they arrived at Bonanno's vehicle, Pieszchata observed Morillo-Vidal place his hand into

13

the red duffle bag containing sham cocaine, picked up brick,
looked at it, and pushed it down.

## 5) Phone Records

The Government also introduced telephone records, as well
as screenshots of various phones seized from members of the
conspiracy, that showed these members in constant and consistent
contact with each other from the date of Seyfried's delivery of
the cocaine to Bonanno on March 3, 2010 to the date of Bonanno's
meeting with Morillo-Vidal at McDonald's on March 4, 2010.
Agent Pieszchata testified that he reviewed all of the
cellphones as well as the associated cellphone records obtained
from Sprint and MetroPCS and prepared charts summarizing the
information.

## 6) Defendant Morillo-Vidal's Testimony

Defendant Morillo-Vidal testified in his own defense.
During direct examination, Morillo-Vidal testified that he
attended Gregorio Luperon High School with a "Carlos Pereida,"
with whom he had been friends for many years, and who he called
"Bubu."  Morillo-Vidal testified that Bubu had a clothing store

14

in Boston, and that he spoke to Bubu in February 2010 as well as in March 2010.   In addition to providing background on his relationship with Bubu, Morillo-Vidal testified as to the circumstances of his arrest, in which Bubu played a role. Specifically, Morillo-Vidal testified that on March 4, 2010, Bubu called him to discuss the problems Bubu was having, and to see if Morillo-Vidal could help Bubu out by getting some paperwork and clothing from his girlfriend because supposedly Bubu and the girlfriend had argued. For these reasons, Morillo-Vidal agreed to go and retrieve the papers and the clothing for Bubu. Morillo-Vidal testified that when he received the number of the girlfriend from Bubu, he called her and made arrangements to meet her at a McDonald's.

Morillo-Vidal admitted that the bag he retrieved from the woman's car "was open," but he denied having seen the kilos of cocaine stuffed inside because the bag "wasn't open in a way you could see straight inside." He testified that he zipped the bag shut and then picked it up, realizing that "it was much heavier than I initially thought."

Morillo-Vidal testified that he met Bonanno at Bubu's request and that Morillo-Vidal believed that she was Bubu's

15

girlfriend or ex-girlfriend from whom he was going to pick up clothes and documents.

Morillo-Vidal's answers during cross examination gave the jury ample grounds to conclude that his testimony was not credible, and permitted the jury to reasonably infer that he was lying about his knowledge of the drugs in order to protect himself and his friend Bubu. Morillo-Vidal testified that after his arrest, he wrote out Bubu's real name for the DEA, but that he misspelled it due to his "nerves." Despite testifying that he had been friends Bubu since high school, Morillo-Vidal could not recall the name of Bubu's alleged clothing store, its address, its telephone number, its website address, or the types of clothes it sold. His lack of recollection of specifics regarding Bubu, including Bubu's address in Boston, the fact that Morillo-Vidal had never visited Bubu in either Boston or New York, and the fact that he did not know where Bubu currently was, could lead a reasonable jury to conclude that Morillo-Vidal was not credible.[1]

---

[1] Moreover, the parties stipulated that Bubu's cellsite records (also reflecting a Florida area code) showed he was in Florida at the time of the transaction, not Boston or New York.

In addition, Morillo-Vidal's testimony that he met Bubu at Gregorio Luperon High School, where they were both students, was contradicted by the testimony of Ruth Fried, a guidance counselor and college advisor there, who testified that she searched the student enrollment records at Gregorio Luperon for records related to Carlos Pereida for each year from 1992 through 1998, but was unable to find any indication that a student by that name had ever been enrolled.  Contrary to the Defendant's contention at oral argument on the instant motions, Ruth Fried was subject to a reliability hearing.

Special Agent Throne further testified that Morillo-Vidal stated after his arrest that he had not spoken to anyone about the exchange on March 4, 2010, and that the exchange had been planned four days before. During cross-examination, Morillo-Vidal testified that he did not remember stating that the exchange had been planned four days earlier. He also testified that the last time he saw Bubu was in 1997, but corrected himself and said that he actually saw Bubu in 2007. Morillo-Vidal testified that he did not know what Bubu's girlfriend looked like, did not know what she was wearing, did not know her name, and did not bother to ask either Bubu or Bonanno for it. It was reasonable, therefore, for the jury to conclude that

Morillo-Vidal's testimony regarding his involvement in the cocaine pick-up on the evening of March 4, 2010, was not credible.


## Defendants' Rule 33 Motions are Dismissed


Cartagena argues that a new trial is warranted because: (1) the Court should not have permitted evidence of Cartagena's prior trip with Seyfried to Los Angeles to deliver $250,000 in narcotics proceeds to be introduced; and (2) the weight of the evidence warrants a new trial.  See Cartagena Br. at 14-16. Morillo-Vidal argues that the weight of the evidence warrants a new trial.  Specifically, Morillo-Vidal contends that his account of the events that transpired on the evening of March 4, 2010, and the testimony of his character witnesses, proves Morillo-Vidal's innocence. See Morillo-Vidal Br. at 13-25.


To the extent Cartagena argues that a new trial is warranted because the Court permitted evidence of a prior trip he made with James Seyfried to deliver approximately $250,000 worth of drug proceeds, that evidence was properly admitted as background. See United States v. Reifler, 446 F.3d 65, 91-92 (2d Cir. 2006) (evidence is admissible "to provide background for

18

the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged.") (citations and internal quotation marks omitted); United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (evidence of uncharged crimes is admissible if "it is necessary to complete the story of the crime on trial") (quoting United States v. Gonzalez, 110 F.3d 936 (2d Cir. 1997)). Moreover, the probative value of the Los Angeles evidence was not outweighed by its potential prejudicial effect and lack of possibility that the jury convicted based upon the Los Angeles evidence alone, given the weight of other evidence presented at trial.

As set forth above, there was sufficient evidence for the jury to conclude that Cartagena and Morillo-Vidal knowingly participated in a conspiracy to distribute more than five kilograms of cocaine, that Cartagena possessed with the intent to distribute more than five kilograms of cocaine, and that Morillo-Vidal attempted to possess with the intent to distribute more than five kilograms of cocaine. Accordingly, there is no basis for a grant of a new trial.

19

**Conclusion**

Based upon the conclusions set forth above, Defendants' motions for judgment of acquittal and, in the alternative, for a new trial are denied.

It is so ordered.

New York, NY

April /8, 2011

ROBERT W. SWEET
U.S.D.J.

20